497 So.2d 1188 (1986)
STATE of Florida, et al., Appellants,
v.
Wade POWELL, et Ux., et al., Appellees.
No. 67755.
Supreme Court of Florida.
October 30, 1986.
Rehearing Denied December 22, 1986.
Jim Smith, Atty. Gen. and Kenneth McLaughlin, Asst. Atty. Gen., Tallahassee, for State of Florida.
Alan C. Sundberg, George N. Meros, Jr. and F. Townsend Hawkes of Carlton, Fields, Ward, Emmanuel, Smith and Cutler, Tallahassee, for Medical Eye Bank, Inc., North Florida Lions Eye Bank, Inc., and Florida Lions Eye Bank, Inc.
Andrew G. Pattillo, Jr. and Russell W. LaPeer of Patillo and McKeever, Ocala, for William H. Shutze, M.D., Thomas M. Techman, M.D., and Keith Gauger.
Craig A. Dennis of Perkins & Collins, Tallahassee, for Florida Society of Ophthalmology, Inc.
*1189 Donald W. Weidner, Associate Gen. Counsel, Jacksonville, for Florida Medical Association, Inc.
Robert A. Ginsburg, Dade Co. Atty. and Robert L. Blake, Asst. Co. Atty., Public Health Division, Jackson Memorial Hospital, Miami, for Dade County, intervenor.
Jerome J. Bornstein and Mark P. Lang, Staff Counsel, American Civil Liberties, Orlando, and Stephen T. Maher, American Civil Liberties Union Foundation of Florida, Inc., University of Miami School of Law, Coral Gables, for Wade Powell and Freda Powell.
James T. Reich, and Jack Singbush of Jack Singbush, P.A., Ocala, for Erwin White and Susan White.
Frederick H. von Unwerth of Kilpatrick & Cody, Washington, D.C., for the Eye Bank Association of America, Inc., amicus curiae.
Melinda L. McNichols of Arky, Freed, Stearns, Watson, Greer and Weaver, P.A., Miami, for Reverand Thomas J. Price, amicus curiae.
Benedict P. Kuehne of Bierman, Sonnett, Shohat and Sale, P.A., Miami, for the Rabbinical Association of Greater Miami, Temple Beth Or, and Rabbi Rami Shapiro, PH.D., amicus curiae.
OVERTON, Justice.
This is a petition to review a circuit court order finding unconstitutional section 732.9185, Florida Statutes (1983), which authorizes medical examiners to remove corneal tissue from decedents during statutorily required autopsies when such tissue is needed for transplantation. The statute prohibits the removal of the corneal tissue if the next of kin objects, but does not require that the decedent's next of kin be notified of the procedure. The Fifth District Court of Appeal certified that this case presents a question of great public importance requiring immediate resolution by this Court. We accept jurisdiction pursuant to article V, section 3(b)(5), Florida Constitution, and, for the reasons expressed below, find that the statute is constitutional.
The challenged statute provides:
Corneal removal by medical examiners. 
(1) In any case in which a patient is in need of corneal tissue for a transplant, a district medical examiner or an appropriately qualified designee with training in ophthalmologic techniques may, upon request of any eye bank authorized under s. 732.918, provide the cornea of a decedent whenever all of the following conditions are met:
(a) A decedent who may provide a suitable cornea for the transplant is under the jurisdiction of the medical examiner and an autopsy is required in accordance with s. 406.11.
(b) No objection by the next of kin of the decedent is known by the medical examiner.
(c) The removal of the cornea will not interfere with the subsequent course of an investigation or autopsy.
(2) Neither the district medical examiner nor his appropriately qualified designee nor any eye bank authorized under s. 732.918 may be held liable in any civil or criminal action for failure to obtain consent of the next of kin.
The trial court decided this case by summary judgment. The facts are not in dispute. On June 15, 1983, James White drowned while swimming at the city beach in Dunellon, Florida. Associate Medical Examiner Dr. Thomas Techman, who is an appellant in this cause, performed an autopsy on James' body at Leesburg Community Hospital. On July 11, 1983, Anthony Powell died in a motor vehicle accident in Marion County. Medical Examiner Dr. William H. Shutze, who is also an appellant in this cause, performed an autopsy on Anthony's body. In each instance, under the authority of section 732.9185, the medical examiner removed corneal tissue from the decedent without giving notice to or obtaining consent from the parents of the decedent.
*1190 James' and Anthony's parents, who are the appellees in this case, each brought an action claiming damages for the alleged wrongful removal of their sons' corneas and seeking a judgment declaring section 732.9185 unconstitutional.[1] The actions were subsequently consolidated.
In its judgment, the trial court noted that section 732.9185 "has as its purpose the commendable and laudable objective of providing high quality cornea tissue to those in need of same," but declared the statute unconstitutional on the grounds that it (1) deprives survivors of their fundamental personal and property right to dispose of their deceased next of kin in the same condition as lawful autopsies left them, without procedural or substantive due process of law; (2) creates an invidious classification which deprives survivors of their right to equal protection; and (3) permits a taking of private property by state action for a non-public purpose, in violation of article X, section 6(a), of the Florida Constitution. The court concluded that the state has no compelling interest in non-consensual removal of appellees' decedents' corneal tissue that outweighs the survivors' right to dispose of their sons' bodies in the condition death left them.[2] For the reasons expressed below, we reject these findings.
In addressing the issue of the statute's constitutionality, we begin with the premise that a person's constitutional rights terminate at death. See Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Silkwood v. Kerr-McGee Corp., 637 F.2d 743 (10th Cir.1980), cert. denied, 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981); Guyton v. Phillips, 606 F.2d 248 (9th Cir.1979), cert. denied, 445 U.S. 916, 100 S.Ct. 1276, 63 L.Ed.2d 600 (1980). If any rights exist, they belong to the decedent's next of kin.
Next, we recognize that a legislative act carries with it the presumption of validity and the party challenging a statute's constitutionality must carry the burden of establishing that the statute bears no reasonable relation to a permissible legislative objective. Johns v. May, 402 So.2d 1166 (Fla. 1981). See also Harrah Independent School District v. Martin, 440 U.S. 194, 198, 99 S.Ct. 1062, 1064, 59 L.Ed.2d 248 (1979). In determining whether a permissible legislative objective exists, we must review the evidence arising from the record in this case.
The unrebutted evidence in this record establishes that the State of Florida spends approximately $138 million each year to provide its blind with the basic necessities of life. At present, approximately ten percent of Florida's blind citizens are candidates for cornea transplantation, which has become a highly effective procedure for restoring sight to the functionally blind. As advances are made in the field, the number of surgical candidates will increase, thereby raising the demand for suitable corneal tissue. The increasing number of elderly persons in our population has also created a great demand for corneas because corneal blindness often is age-related. Further, an affidavit in the record states:
Corneal transplants are particularly important in newborns. The brain does not learn to see if the cornea is not clear. There is a critical period in the first few months of life when the brain "learns to *1191 see." If the cornea is not clear, the brain not only does not "learn to see," but the brain loses its ability to "learn to see." Hence, corneal transplant in children must be made as soon as practicable after the problem is discovered. Without the medical examiner legislation, there would be virtually no corneal tissue available for infants and these children would remain forever blind.
The record reflects that the key to successful corneal transplantation is the availability of high-quality corneal tissue and that corneal tissue removed more than ten hours after death is generally unsuitable for transplantation. The implementation of section 732.9185 in 1977 has, indisputably, increased both the supply and quality of tissue available for transplantation. Statistics show that, in 1976, only 500 corneas were obtained in Florida for transplantation while, in 1985, more than 3,000 persons in Florida had their sight restored through corneal transplantation surgery.
The record also demonstrates that a qualitative difference exists between corneal tissue obtained through outright donation and tissue obtained pursuant to section 732.9185. In contrast to the tissue donated by individuals, which is largely unusable because of the advanced age of the donor at death, approximately eighty to eighty-five percent of tissue obtained through medical examiners is suitable for transplantation. The evidence establishes that this increase in the quantity and quality of available corneal tissue was brought about by passage of the statute and is, in large part, attributable to the fact that section 732.9185 does not place a duty upon medical examiners to seek out the next of kin to obtain consent for cornea removal. An affidavit in the record reveals that, before legislation authorized medical examiners in California to remove corneas without the consent of the next of kin, the majority of the families asked by the Los Angeles medical examiner's office responded positively; however, approximately eighty percent of the families could not be located in sufficient time for medical examiners to remove usable corneal tissue from the decedents.
An autopsy is a surgical dissection of the body; it necessarily results in a massive intrusion into the decedent. This record reflects that cornea removal, by comparison, requires an infinitesimally small intrusion which does not affect the decedent's appearance. With or without cornea removal, the decedent's eyes must be capped to maintain a normal appearance.
Our review of section 732.9185 reveals certain safeguards which are apparently designed to limit cornea removal to instances in which the public's interest is greatest and the impact on the next of kin the least: corneas may be removed only if the decedent is under the jurisdiction of the medical examiner; an autopsy is mandated by Florida law; and the removal will not interfere with the autopsy or an investigation of the death. Further, medical examiners may not automatically remove tissue from all decedents subject to autopsy; rather, a request must be made by an eye bank based on a present need for the tissue.
We conclude that this record clearly establishes that this statute reasonably achieves the permissible legislative objective of providing sight to many of Florida's blind citizens.
We next address the trial court's finding that section 732.9185 deprives appellees of a fundamental property right. All authorities generally agree that the next of kin have no property right in the remains of a decedent. Although, in Dunahoo v. Bess, 146 Fla. 182, 200 So. 541 (1941), this Court held that a surviving husband had a "property right" in his wife's body which would sustain a claim for negligent embalming, id. at 183, 200 So. at 542, we subsequently clarified our position to be consistent with the majority view that the right is limited to "possession of the body ... for the purpose of burial, sepulture or other lawful disposition," and that interference with this right gives rise to a tort action.[3]Kirksey *1192 v. Jernigan, 45 So.2d 188, 189 (Fla. 1950). More recently, we affirmed the district court's determination that the next of kin's right in a decedent's remains is based upon "the personal right of the decedent's next of kin to bury the body rather than any property right in the body itself." Jackson v. Rupp, 228 So.2d 916, 918 (Fla. 4th DCA 1969), affirmed, 238 So.2d 86 (Fla. 1970). The view that the next of kin has no property right but merely a limited right to possess the body for burial purposes is universally accepted by courts and commentators. See Lawyer v. Kernodle, 721 F.2d 632 (8th Cir.1983); Sinai Temple v. Kaplan, 54 Cal. App.3d 1103, 127 Cal. Rptr. 80 (1976); Dougherty v. Mercantile-Safe Deposit & Trust Co., 282 Md. 617, 387 A.2d 244 (Ct.App. 1978); Finn v. City of New York, 70 Misc.2d 947, 335 N.Y.S.2d 516 (Civ.Ct. 1972), rev'd on other grounds, 76 Misc.2d 388, 350 N.Y.S.2d 552 (Sup.Ct. 1973); Sullivan v. Catholic Cemeteries, Inc., 113 R.I. 65, 317 A.2d 430 (1974); Sadler & Sadler, Transplantation and the Law: The Need for Organized Sensitivity, 57 Geo. L.J. 5 (1968); Sanders & Dukeminier, Medical Advance and Legal Lag: Hemodialysis and Kidney Transplantation, 15 U.C.L.A.L.Rev. 357 (1968). Prosser states:
A number of decisions have involved the mishandling of dead bodies... . In these cases the courts have talked of a somewhat dubious "property right" to the body, usually in the next of kin, which did not exist while the decedent was living, cannot be conveyed, can be used only for the one purpose of burial, and not only has no pecuniary value but is a source of liability for funeral expenses. It seems reasonably obvious that such "property" is something evolved out of thin air to meet the occasion, and that it is in reality the personal feelings of the survivors which are being protected, under a fiction likely to deceive no one but a lawyer.
W. Prosser, The Law of Torts, 43-44 (2d ed. 1955) (footnotes omitted). The Maryland Court of Appeals has summarized the law as follows:
It is universally recognized that there is no property in a dead body in a commercial or material sense. "[I]t is not part of the assets of the estate (though its disposition may be affected by the provision of the will); it is not subject to replevin; it is not property in a sense that will support discovery proceedings; it may not be held as security for funeral costs; it cannot be withheld by an express company, or returned to the sender, where shipped under a contract calling for cash on delivery; it may not be the subject of a gift causa mortis; it is not common law larceny to steal a corpse. Rights in a dead body exist ordinarily only for purposes of burial and, except with statutory authorization, for no other purpose." Snyder v. Holy Cross Hosp., 30 Md. App. 317 at 328 n. 12, 352 A.2d 334 at 340, quoting P.E. Jackson, The Law of Cadavers and of Burial and Burial Places (2d ed. 1950).
Dougherty, 282 Md. at 620 n. 2, 387 A.2d at 246 n. 2.
Under the facts and circumstances of these cases, we find no taking of private property by state action for a non-public purpose in violation of article X, section 6, of the Florida Constitution. We note that the right to bring an action in tort does not necessarily invoke constitutional protections. Decisions of the United States Supreme Court have clearly established that the loss of a common law right by legislative act does not automatically operate as a deprivation of substantive due process. Tort actions may be restricted when necessary to obtain a permissible legislative objective. See Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 88 n. 32, 98 S.Ct. 2620, 2638 n. 32, 57 L.Ed.2d 595 (1978).
*1193 Appellees also assert that their right to control the disposition of their decedents' remains is a fundamental right of personal liberty protected against unreasonable governmental intrusion by the due process clause. Appellees argue that, because the statute permits the removal of a decedent's corneas without reference to his family's preferences, it infringes upon a right, characterized as one of religion, family, or privacy, which is fundamental and must be subjected to strict scrutiny. Appellees rely upon a line of decisions from the United States Supreme Court which recognize the freedom of personal choice in matters of family life as one of the liberties protected by the due process clause. See, e.g., Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Appellees also point out that the United States Supreme Court has found rights to personal privacy in connection with activities relating to marriage, Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); procreation, Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); contraception, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); abortion, Roe v. Wade; and child-rearing and education, Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). According to appellees, the theme which runs through these cases, and which compels the invalidation of section 732.9185, is the protection from governmental interference of the right of free choice in decisions of fundamental importance to the family.
We reject appellees' argument. The cases cited recognize only freedom of choice concerning personal matters involved in existing, ongoing relationships among living persons as fundamental or essential to the pursuit of happiness by free persons. We find that the right of the next of kin to a tort claim for interference with burial, established by this Court in Dunahoo, does not rise to the constitutional dimension of a fundamental right traditionally protected under either the United States or Florida Constitution. Neither federal nor state privacy provisions protect an individual from every governmental intrusion into one's private life, see Florida Board of Bar Examiners Re: Applicant, 443 So.2d 71 (Fla. 1983), especially when a statute addresses public health interests. Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (state accorded wide latitude in constitutional privacy terms to safeguard health); Roe v. Wade (review less exacting when state asserts effort to safeguard health).
The record contains no evidence that the appellees' objections to the removal of corneal tissues for human transplants are based on any "fundamental tenets of their religious beliefs." Wisconsin v. Yoder, 406 U.S. at 218, 92 S.Ct. at 1534. "[T]he very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." Id. at 215-16, 92 S.Ct. at 1533.
We also reject the trial court's finding that section 732.9185 creates an invidious classification regarding the next of kin of deceased persons. "Legislatures have wide discretion in passing laws that have the inevitable effect of treating some people differently from others." Parham v. Hughes, 441 U.S. 347, 351, 99 S.Ct. 1742, 1745, 60 L.Ed.2d 264 (1979). We find that the statute's effect on the next of kin is incidental and does not offend equal protection.
In view of our finding that the appellees have no protectable liberty or property interest in the remains of their decedents, we need not address the argument that section 732.9185 violates procedural safeguards guaranteed by the due process clause. See Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).
In conclusion, we hold that section 732.9185 is constitutional because it rationally promotes the permissible state objective of *1194 restoring sight to the blind.[4] In so holding, we note that laws regarding the removal of human tissues for transplantation implicate moral, ethical, theological, philosophical, and economic concerns which do not readily lend themselves to analysis within a traditional legal framework. Applying constitutional standards of review to section 732.9185 obscures the fact that at the heart of the issue lies a policy question which calls for a delicate balancing of societal needs and individual concerns more appropriately accomplished by the legislature.
For the reasons expressed, we reverse the trial court's order and remand this cause to the trial court with directions to enter judgment consistent with this opinion.
It is so ordered.
McDONALD, C.J., and ADKINS, BOYD, EHRLICH and BARKETT, JJ., concur.
SHAW, J., dissents with an opinion.
SHAW, Justice, dissenting.
Before setting out my disagreements with the substance of the majority opinion, it is necessary to first clarify the procedural posture of these cases.
The Whites brought a complaint in four counts against appellants Gauger, Techman and Shutze concerning the circumstances surrounding an autopsy and cornea removal performed on their teenage son following his accidental drowning on 15 June 1983. Techman and Shutze are medical doctors and, respectively, an assistant medical examiner and the medical examiner in the Fifth Judicial Circuit. Gauger is a non-medical investigator in Marion County. As amended in four counts, the complaint alleges, inter alia, as follows. Count I alleges that the Whites had objected to the autopsy and any alteration of their son's body; that no cause of death other than accidental drowning was reasonable in that five persons, including an off-duty highway patrolman, had witnessed the drowning; that appellant Shutze had established a policy and mechanism for performing autopsies on all drowning victims contrary to section 406.11, Florida Statutes (1981); that decisions on autopsies in Marion County are made by Gauger, a private employee of Shutze & Techman P.A., who obtains and transports bodies to Lake County where autopsies are performed; that appellant Shutze permitted Gauger to falsely represent himself as a member of the medical examiner's staff; that Shutze & Techman P.A. performed autopsies on a piecework basis and directly benefited from the number of autopsies performed; that the autopsy was performed contrary to section 872.04, Florida Statutes (1981); that appellant Gauger was untrained in opthamology and unqualified to be designated under section 732.9185, Florida Statutes (1981), as a person to provide corneas; that conditions precedent to removal of corneas under section 732.9185 were not met; and that the Whites have suffered damages by reason of extreme mental pain and anguish for which compensatory and punitive damages should be paid. Counts II and III are actions pursuant to chapter 86, Florida Statutes (1981), seeking declaratory judgments as to the Whites' rights, duties, and privileges under sections 732.9185 and 406.11 which allege that both sections are unconstitutional both facially and as applied. Count IV is an action alleging violation of civil rights under Title 42, U.S.C. § 1983 and the United States Constitution.
The Powells also brought a complaint in four counts against appellants Shutze and Monroe Regional Medical Center (MRMC) concerning the autopsy and cornea removal performed on their twenty-year-old son following his death in a single vehicle accident on 11 July 1983. Count I alleges that appellants performed an arbitrary, capricious and unlawful autopsy and removed corneas without meeting the conditions precedent of section 732.9185. Count II *1195 alleges that section 732.9185 is facially unconstitutional and directly contrary to section 732.910, et seq., Florida Statutes (1981). Counts III and IV allege mental anguish and financial loss caused by, respectively, appellants Shutze and MRMC.
The two cases were consolidated and came before the trial judge on motions for summary judgment. In the order under appeal, the trial judge found that section 406.11 was constitutional on its face and as applied, but that section 732.9185 was facially unconstitutional. The trial judge did not rule on a motion that section 732.9185 was unconstitutional as applied. The order comes directly to us on the certification of the Fifth District Court of Appeal that it contains a question of great public importance which requires immediate resolution.
The only question legitimately before us is whether the trial court erred in granting a summary judgment that section 732.9185 is facially unconstitutional. In the present posture of the case, we are not present with the issues of whether sections 406.11 and 732.9185 were complied with in performing these autopsies and cornea removals, of whether the two sections have been constitutionally applied, of whether section 406.11 is facially constitutional, of whether any or all of the appellants are liable, and of the Whites' rights, duties and privileges under sections 406.11 and 732.9185. Without specifying that it is addressing the narrow issue of the facial constitutionality of section 732.9185, the majority opinion addresses a wide range of issues which are only tenuously related to the narrow issue before us. The majority then reverses and remands with directions that a judgment for appellants (defendants) be entered. In my view this disposition is completely premature. My review of the record indicates there are substantial questions of material fact which preclude entry of summary judgments for the defendants.
The thrust of the majority opinion appears to be that the state and its agents have an unqualified right to the body of a decedent provided at some point the remains of the remains are turned over to the next of kin. I do not believe this is the law. I am persuaded, as was the trial judge below, that since time immemorial it has been the duty and the right of the next of kin to take control, possession, and custody of the body and remains of a deceased family member. These duties and rights, predicated on religious, moral, and philosophical grounds, were recognized at common law and were not totally surrendered to the state when our constitutions were adopted. These rights are not only reserved to the people under article I, section 1 of the Florida Constitution, but are affirmatively protected as religious, liberty, and privacy rights under article I, sections 3, 9, and 23 and by various statutes of the state.
The scope of the common law and the rights retained by the people should not, in my view, be narrowly construed. As the United States Supreme Court has said:
What is the common law? According to Kent: "The common law includes those principles, usages, and rules of action applicable to the government and security of person and property, which do not rest for their authority upon any express and positive declaration of the will of the legislature." 1 Kent, Com. 471. As Blackstone says: "Whence it is that in our law the goodness of a custom depends upon its having been used time out of mind; or, in the solemnity of our legal phrase, time whereof the memory of man runneth not to the contrary. This it is that gives it its weight and authority; and of this nature are the maxims and customs which compose the common law, or lex non scripta, of this Kingdom. This unwritten, or common, law is properly distinguishable into three kinds: 1. General customs; which are the universal rule of the whole Kingdom, and form the common law, in its stricter and more usual signification." 1 Bl.Com. 67. In Black's Law Dictionary, page 232, it is thus defined: "As distinguished from law created by the enactment of legislature, the common law comprises the body of those principles and rules of action *1196 relating to the government and security of persons and property, which derive their authority solely from usages and customs of immemorial antiquity, or from the judgments and decrees of the courts recognizing, affirming, and enforcing such usages and customs; and, in this sense, particularly the ancient unwritten law of England."
Western Union Telegraph Co. v. Call Publishing Co., 181 U.S. 92 101-02, 21 S.Ct. 561, 564, 45 L.Ed. 765 (1901) (emphasis supplied). The right to privacy under section 23 is particularly pertinent in my view because the right to be let alone and to be free from government intrusion into private life is, in large part, simply a constitutional affirmation of common law rights and customs surrounding the exercise of private, as contrasted to public, liberties. The right to possess and control the body of a deceased loved one and to honor and celebrate the decedent's life and death through appropriate commemoration is a quintessential privacy right.
These personal rights of the next of kin are qualified only by the overriding police power of the state to regulate the care and disposition of dead bodies for the protection of public health and welfare. I have no doubt that the state may require an autopsy when there is a founded suspicion that death was by criminal action, when there is a likelihood that the death was caused by a communicable disease, or, even, when the death is simply inexplicable and the cause needs to be determined. I do not agree that the agents of the state may be constitutionally granted carte blanche to conduct autopsies based on whim, bureaucratic convenience, curiosity, pecuniary gain, or "policy." A significant question of material fact is whether the agents exceeded their statutory authority and we should have this issue resolved before we address the constitutionality of the statutes. The record consists largely of a series of depositions and affidavits taken or given in connection with the Whites' complaint and with the motions for summary judgments. The Powells' complaint was filed well after the Whites' complaint and contains little of record.
The assistant state attorney assigned to Marion County was deposed and testified as follows regarding the policy of performing autopsies. He was of the opinion that autopsies should be conducted on all drowning and vehicle accident victims and had communicated this policy to the medical examiner and law enforcement personnel. Autopsies were necessary even if there was no suggestion of criminal culpability or doubt about the cause of death. Autopsies were needed in case there were civil suits arising from the death and were important to insurance companies, families, and anyone who might have an interest in the facts. He did not believe the medical examiner had discretion to forego an autopsy when one of the enumerated circumstances of section 406.11 existed, for example, an accidental death. He had conducted an investigation into the cornea removals from decedent White and found the removals were performed on the authority of the investigator, appellant Gauger. Further, in his opinion, there had been an objection by the White family to the removal of the corneas prior to their removal.
The medical examiner, appellant Shutze, recited the following in two affidavits. It is the policy of the medical examiner's office to perform full autopsies on all persons who die in Marion County by accident, including, specifically, drowning or motor vehicle accidents. The medical examiner bases this policy on section 406.11 and the request of the state attorney's office. The purposes of autopsies are to (1) determine cause of death, (2) identify health or safety hazards, (3) obtain evidence of criminal conduct, and (4) advance the understanding of medical science. Appellant Gauger is an investigator working for appellant Shutze's professional association; he is not an employee of the medical examiner's office. Appellant Gauger has been instructed to notify the medical examiner's office of all deaths in Marion County. Appellant Gauger is the medical examiner's authorized designee for Marion County under section 732.9185. The medical examiner or an assistant *1197 medical examiner makes the final decision on whether an autopsy should be performed in each specific instance. Appellant Techman performed the autopsy on the Whites' decedent and appellant Shutze performed the autopsy on the Powells' decedent. Objections to autopsies are considered but the final decision is made by the medical examiner or assistant medical examiner. Objections to cornea removals are not solicited but are honored if known. Eye bank personnel, not the medical examiner's office, determine the suitability of corneas for transplant.
The assistant medical examiner, appellant Techman, in an affidavit recited statements on the general policy and practices of the medical examiner's office which parallel those of appellant Shutze. In addition, appellant Techman recited that he performed the White autopsy and signed the death certificate. He alone made the decision to perform the autopsy, relying on policy, section 406.11, and the request of the state attorney's office. He had no police report available and his only knowledge of the circumstances surrounding the death was based on the investigator's report by appellant Gauger. The report reflected the contact with the family but did not indicate any objection to an autopsy. Had there been any, he would nevertheless have performed the autopsy. He had no knowledge that the corneas were going to be removed, did not authorize their removal, and learned of their removal for the first time when he began the autopsy.
Appellee White was deposed and testified as follows. He was called to the hospital where his son's body had been taken and met with appellant Gauger. He never met or talked with appellants Shutze and Techman. Appellant Gauger told him that the son's death was a simple accidental drowning with no suggestion of foul play. However, he was told state law required an autopsy be performed and that the body was to be shipped to another county for that autopsy. Appellee White objected strenuously to the autopsy but believed he had no recourse under the law and asked that the intrusion be kept to a minimum. Appellant Gauger told him it would only be necessary to make a small incision into the chest to probe the lungs. Nothing was said of cornea removal and he only learned of it when he viewed his son's body at the funeral home following the return of the body after the autopsy. The body's eyes, particularly the right eye, were noticeably sunken into the skull. The funeral director explained this sunken condition of the eyes as caused by the cornea removal.
The record also contains minor corrections to a deposition by appellant Gauger. However, the deposition itself is not contained in the record. This deposition could be highly significant in that appellant Gauger appears to be the central figure in these episodes.
Attempting to recount all of the significant questions of material fact which appear on the face of this record would be excessively burdensome and would be of little benefit at this stage of the proceedings. Moreover, any list would likely be incomplete. It is appropriate, however, to refer to several as illustrative of the issues not yet addressed. The two overarching issues are, first, whether the policies and practices of the medical examiner's office followed in these two cases are consistent with the provisions of sections 406.11 and 732.9185. Second, assuming the statutes were complied with, were they constitutionally applied. Section 925.09, Florida Statutes (1981), authorizes the state attorney to have an autopsy performed when "it is necessary in determining whether or not death was the result of a crime." Two significant questions of material fact engendered by this section are whether these two autopsies, and accompanying cornea removals, were performed under the authority of the state attorney, and, if so, was that authority legally exercised. Section 406.11(1) authorizes the medical examiner to perform such autopsies as he deems necessary to determine the cause of death. An additional question of material fact is whether the medical examiner's office has a policy or practice of performing autopsies on all accident victims, specifically drowning *1198 and vehicle accident victims. In this connection, I note also section 872.01, Florida Statutes (1981), titled Dealing in dead bodies; section 872.04, Florida Statutes (1981), titled Autopsies; consent required, exception; and chapter 936, Florida Statutes (1981), titled Inquests of the Dead. Significant questions of material fact also arise in connection with section 732.9185. Two general questions, with numerous subsidiary questions, are whether the conditions precedent to cornea removal were present and whether the provisions of section 732.9185 were followed. The issue of the constitutionality of sections 406.11 and 732.9185, as applied, is inchoate at this stage of the proceeding.
The legislature is apparently of the view, contrary to the majority, that a decedent's next of kin have the right to possess and control the decedent's body and that both the decedent and next of kin may control the removal and donation of human organs. The various provisions of chapter 245, Florida Statutes (1981), titled Disposition of Dead Bodies, are grounded on the right of the next of kin to claim control and possession of dead bodies. Section 245.07 appears to rule out the state's use of dead bodies for the advancement of medical science unless the bodies are unclaimed or donated under section 245.11.[1] On the question of the donation and removal of organs, chapter 732, part X, Florida Statutes (1985), authorizes and establishes programs whereby both the decedent and survivors may donate organs of a decedent. Section 732.912 is particularly pertinent. Subsection (1) authorizes the donation of organs by will; subsection (2) authorizes the donation of a decedent's organs by next of kin in a priority order and also recognizes the right of next of kin to veto the removal or donation of organs. Moreover, section 732.9185(1)(b) itself recognizes the right of the next of kin to veto the donation of the cornea.[2] The crucial point is that part X of chapter 732 is grounded on the right of the decedent and next of kin to control the removal and disposition of organs taken from the body of the decedent. If this is not so, part X is grounded on air. It is a conundrum in that it is simply not legally possible nor permissible to donate or control the donation of an article which does not belong to the donor.
I agree that these cases present issues of great public importance which may, at some point, require this Court's attention. At this point, however, there is substantial doubt that sections 406.11 and 732.9185 have been correctly interpreted and applied by the cognizant authorities in Marion County. The issues presented by these suits, particularly the counts requesting a declaratory judgment of the rights, duties, and privileges of the next of kin, are likely to be with us a long time and to become even more intense as medical science advances and organ transplants increase in number. I am simply not prepared to rush to judgment on issues as important as these based on a summary judgment. These issues are important, but we are not a legislative body rushing to enact emergency legislation to meet an urgent state need before the end of a legislative session. These cases should be remanded with instructions that the trial go forward and a record be developed.
NOTES
[1] The Whites named as defendants Shutze, Techman, Keith Gauger, who is an investigator for the medical examiner's office in that district, and the State of Florida. The Powells named as defendants Shutze and the Monroe Regional Medical Center. Dade County, The Medical Eye Bank, Inc., North Florida Lions Eye Bank, Inc., Florida Lions Eye Bank, Inc., Florida Medical Association, Inc., Florida Society of Ophthalmology, Inc., and Eye Bank Association of America, Inc., were each permitted to intervene as parties in support of the constitutionality of section 732.9185. The Reverend Thomas J. Price of the Florida Conference of United Methodist Churches and the Rabbinical Association of Greater Miami filed amicus briefs in support of the appellees' position.
[2] The appellees also challenged as unconstitutional § 406.11, Fla. Stat. (1983), which provides medical examiners with the authority to perform autopsies under circumstances enumerated in the statute. The trial court upheld that statutory provision, and that finding is not challenged in this proceeding.
[3] The American Law Institute sets forth the tort of interfering with the "right of burial" as follows:

"One who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body." Restatement (Second) of Torts § 868 (1979).
[4] Courts in Georgia and Michigan have upheld the constitutionality of cornea removal statutes similar to Florida's. See Georgia Lions Eye Bank, Inc. v. Lavant, 255 Ga. 60, 335 S.E.2d 127 (1985), cert. denied, ___ U.S. ___, 106 S.Ct. 1464, 89 L.Ed.2d 721 (1986); Tillman v. Detroit Receiving Hospital, 138 Mich. App. 683, 360 N.W.2d 275 (1984).
[1] This does not mean that medical science may not be advanced as a by-product of autopsies which are legally conducted for other reasons under § 406.11. It does suggest, however, that advancement of medical science, without more, is not legal justification for conducting an autopsy on bodies which come into the hands of the medical examiner.
[2] Section 732.9185(1)(b) states: "[n]o objection by the next of kin of the decedent is known by the medical examiner." Subsection (2) provides that the medical examiner will not be held liable for "failure to obtain consent of the next of kin." The words "failure to obtain" suggest an unsuccessful effort. These provisions are apparently being interpreted as authority not to seek consent from next of kin who are physically present and readily available to grant or deny consent. Is that the legislative intent? The trial court should hear arguments and address this point.